## STATE OF VERMONT
## ENVIRONMENTAL COURT

|                                          |   |                              |
|------------------------------------------|---|------------------------------|
|                                          | } |                              |
|                                          | } | **Docket No. 64-3-05Vtec**   |
| **In Re: Appeal of Nanak Hospitality**   | } | **Appeal from municipal**    |
| **PUD & Site Plan**                      | } | **Planning Commission**      |
|                                          | } |                              |

## Decision and Order

Nanak Hospitality, LLC (hereinafter referred to alternately as Nanak, Appellant and Applicant) filed its appeal with this Court on March 28, 2005, from the March 16, 2005 Decision of the Town of Killington Planning Commission (Planning Commission), denying Nanak's application for a planned unit development and site plan review to convert a portion of the previously-constructed facilities of the former Killington Center for the Arts into a 92-room[1] commercial lodging facility and separate office building. Appellant asserted in its Revised Statement of Questions of May 6, 2005, that the Planning Commission "found and concluded that applicant/appellant complied with all of the applicable criteria . . . with one exception" concerning conformance with the applicable side yard setback requirements.

The Court scheduled and completed a merits hearing on this appeal on June 24, 2005, Environmental Judge Thomas S. Durkin presiding. John D. Hansen, Esq. appeared as counsel for Appellant Nanak. Kevin E. Brown, Esq. appeared as counsel for the Town of Killington (Town). The trial was followed by a site visit to the property, during which the parties, their respective counsel, and Judge Durkin, observed the buildings and improvements to the subject property, including the easterly border of the property abutting property belonging to Gordon M. Goes and Sammi K. Goes.

---

[1] Nanak initially sought approval to operate a 96-room lodging facility, but then amended its application to a 92-room proposal during the course of its presentation to the Planning Commission.

The proceeding was completed in one full day.  Pursuant to the Court's request, the parties thereafter submitted proposed Findings of Fact and legal memoranda.

On August 1, 2005, Mr. & Mrs. Goes filed a letter with the Court.  On August 11, 2005, Stephanie A. Lorentz, Esq. filed her appearance for Mr. & Mrs. Goes, together with a Motion to Intervene and Reopen Evidence.  Attorney Hansen filed Appellant's response to the Goes' filing by way of letter dated August 5, 2005.

We first address the Goes' motion to intervene and reopen the evidence in this proceeding.

### Intervention by the Goes

Where a party moves to intervene in an on-going proceeding and asserts that their property interest will be impacted by that proceeding, V.R.C.P. 24(a) guides the trial court on the proper use of its discretion in determining whether to grant or deny the intervention request.  That Rule establishes that upon "timely application," intervention should be allowed to anyone who either has a statutory right to intervene or who claims that the pending action may "impair or impede" their property interest, "unless the [intervening] applicant's interest is adequately represented by existing parties."[2]

While determinations on intervention requests are to be made within the sound discretion of the trial court, we are cautioned to exercise this discretion "on a different and higher standard in the case of intervention of right, as opposed to a permissive intervention." Ernst v. Rocky Road, Inc., 141 Vt. 637, 640 (1982) (citing 7A C. Wright & A. Miller, Federal Practice and Procedure § 1916, at 573 (1974); Vermont Pub. Power Supply Auth., 140 Vt. 424, 430-34 (1981)).  In this appeal, it appears beyond dispute that Mr. & Mrs. Goes are asserting a right to intervene, as their property abuts the subject property.  See In re Shantee Point, Inc., 174 Vt. 248, 253 (2002) (owners of abutting

---

[2]  The provisions recited here relate to intervention as of right;  subsection (b) speaks to permissive intervention.

property may file for "intervention as of right" under subsection (a) of V.R.C.P. 24). In fact, the sole substantive issue in this appeal, as characterized by Appellant Nanak in its Revised Statement of Questions, is whether a reduced setback may be permitted along the side-yard boundary adjoining Mr. & Mrs. Goes property. Thus, we are cautioned to give "greater" deference to the Goes' intervention request.

We must next determine if the Goes' request has been timely filed. In an appeal from this Court, In re Garen, 174 Vt. 151 (2002), our Supreme Court held that the Environmental Court may look to the Vermont Rules of Appellate Procedure "in determining what would constitute a reasonable time in which to seek intervention." Id. at 154. The Supreme Court cited to V.R.A.P. 4, which permits other parties to file a notice of appeal within 14 days of the original appeal, and to V.R.A.P. 29 and the former V.R.C.P. 76(e)(4)(B) (now V.R.E.C.P. 5), as examples of filing deadlines that a Court could reference when determining whether intervention has been timely.

The interveners here, the Goes, have not met any of the timeliness standards suggested by the Supreme Court in Garen. In fact, those preliminary filing deadlines that the existing parties were required to abide by here passed many months before the Goes filed their motions. The bench trial was completed and the evidence closed nearly two months before the Goes filed their motion. We therefore find that the Goes' intervention request was untimely and should be denied.

In making this determination, we have taken the following additional factors into consideration. First, we are aware that the Goes assert that they did not receive the certified mailing notice of this appeal forwarded by Attorney Hansen.[3] But we are also aware that the Goes concede that they received notice of the hearing before the

---

[3] Attorney Hansen supplied the Court with a copy of his certified mailing, franked by the U.S. Post Office on April 4, 2005, upon which it was noted that notice of the certified mailing was delivered to the addressees. The following dates appear on the face of the envelope: April 5, 2005; April 13, 2005; May 19, 2005; and May 26, 2005. The enveloped was thereafter stamped as "Unclaimed Refused" and returned to Mr. Hansen. We are unaware of whether the other conditions under V.R.C.P. 4(f) were satisfied for service to be effectuated by refusal.

Planning Commission, but did not attend that hearing and chose not to file a written statement of their concerns with the Commission. The Goes had a number of conversations with Nanak's representatives, but apparently chose not to seek independent verification of Nanak's representations or determine whether Nanak had appealed the Planning Commission's Decision. The Goes would have us place the burden on the Appellant and others to advise abutters who chose not to participate below of when an appeal was filed with this Court. Both our procedural rules and the provisions of Title 24, Chapter 117 place the burden upon non-parties who may be considering intervention, like the Goes, to monitor municipal permit decisions in cases that may impede or impair their property rights. It is unfortunate that the Goes failed to do so here, as there is little doubt that they would have been permitted to intervene in this proceeding had their request been made on a timely basis.

We understand that the presence of two commercial buildings, less than 30 feet from their shared boundary line, is the motivating factor for the Goes' pursuit of intervention in this case. We note two other factors that also impacted our decision to deny the Goes' request: first, these buildings are pre-existing, having received zoning permit approval in 1999 and constructed later that same year; and second, that the Town chose to play an active role in this appeal, including the trial. The Town presented testimony and legal arguments on the impact upon the Goes' property, in the event Appellant was granted authority to operate a motel in the pre-existing buildings that are less than 30 feet away. Thus, the Court makes the additional determination under V.R.C.P. 24(a)(2) that the Goes' relevant property "interest [was] adequately represented by [an] existing part[y]." V.R.C.P. 24(a)(2). For all these reasons, we deny the Goes' requests to reopen the taking of evidence and allow them to intervene in this proceeding at this very late date.

## Findings of Fact

Based upon the evidence presented at the hearing, including evidence and exhibits stipulated to by the parties, the Court makes the following Findings of Fact and Conclusions of Law:

1. Appellant's application for planned unit development and site plan review is subject to the Killington Zoning Regulations (hereinafter KZR), adopted June 26, 1979, and amended through March 5, 2002.

2. The subject property is the site of the former Rome Family Corporation-Killington Center for the Arts and is located adjacent to the Killington Access Road, so called, in the Town of Killington.

3. The Rome Center for the Arts first received zoning approval in 1999 for use as a school. At that time, the subject property was in the Residential-1 zoning district. Schools were a permitted use in that district. At that time, hotels, motels, and lodges, were not allowed in the Residential-1 District, either as a permitted use or in a planned unit development.

4. Pursuant to their 1999 zoning approval, the Rome Family Corporation (Rome) constructed two 52-room dormitory buildings and started, but did not complete, the construction of an administration/classroom building. Rome also constructed the access road and certain other infrastructure and improvements to serve the project.

5. The two dormitory buildings were constructed in compliance with all then-existing setback requirements, including the minimum 25 feet side setback requirement for permitted uses in the Residential-1 District found in KZR § 240.3.

6. Later in 1999, changes in Rome's business caused it to seek zoning approval to change the permitted use of the property to allow for the leasing of the two dormitory buildings for housing for some of the seasonal employees of the nearby Killington Ski Resort. In its decision of March 9, 1999, the Killington Zoning Board of

Adjustment (ZBA) noted that "hotels, motels and lodges are not permitted uses in the Residential-1 District. . . .. [The ZBA further] ascertained that if the Killington Center for the Arts is not successful, or if only the dormitory buildings were constructed, the buildings would not be used as a commercial lodging facility [and that at] no time shall the dormitory rooms be used for commercial transient or short term lodging."

7. Rome chose not to appeal the March 9, 1999 ZBA Decision, but rather advocated for a change in the zoning regulations. On November 2, 1999, Killington amended its zoning regulations, including a change in the zoning district map that located the subject property in the business zoning district. This amendment brought about two changes that are of material consequence to this case: first, schools were no longer a permitted use in the district where the subject property was located; and second, hotels, motels, and lodges, were a permitted use within a planned unit development in the applicable zoning district.

8. Rome thereafter filed for bankruptcy protection from its creditors. On June 29, 2004, Nanak Hospitality, LLC (the applicant here) purchased the property at a public sale approved by the U.S. Bankruptcy Court.

9. At all times relevant to this proceeding, the subject property contained the two dormitory buildings and the unfinished structure originally intended as a classroom/administration building, as well as the access road and other infrastructure and improvements that Rome originally constructed.

10. In February, 2005, Nanak applied for planned unit development (PUD) and site plan approval to convert the former project into a 96-room commercial lodging facility and office building. The two dormitories would be improved and become a hotel; the unfinished administration/classroom building would be completed and used as an office building. Nanak revised its application while it was being considered by the Planning Commission to reduce the lodging facility to 92 rooms, so as to allow for additional storage space.

11. As part of its application, Nanak requested that the Planning Commission reduce the side yard setback requirement. Under the amended zoning regulations, a PUD was required to have a side yard setback of no less than 100 feet, per KZR § 240.8, unless the Commission determined, pursuant to KZR § 505(5), that "special circumstances" would make that setback requirement "inappropriate" for the specific PUD project. The nearest pre-existing dorm building is just over 25 feet from the side boundary line shared with Mr. & Mrs. Goes. This measurement is taken from the building itself and not from any steps or roof overhang, pursuant to KZR § 120.

12. The Planning Commission specifically found and concluded that Nanak's proposed conversion of the existing buildings complied with all PUD and site plan criteria under KZR §§ 505 and 510, except for the PUD side yard setback requirement of 100 feet contained in § 240.8. The Planning Commission determined that the "special circumstances" test to reduce the setback found in § 505(5) had not been met.

13. Rome installed a wooden, 6 to 8-foot high fence along the boundary shared with Mr. & Mrs. Goes, which also runs parallel to the two former dormitory buildings.

14. The Goes' property nearest to the former dormitory buildings is heavily wooded. The parties represented at hearing that this portion of the Goes' property is undeveloped. Testimony at hearing, confirmed by the subsequent site visit, represented that an intermittent stream on the Goes' property runs parallel to the portion of their property abutting the former dormitory buildings.

15. At the time the property was being developed as an Arts Center, the dorm buildings were sited near the Goes' boundary line because of wetlands and buffer zones on other portions of the Applicant's property. It appears that if these buildings were required to conform to a 100-foot side yard setback when designed and built, they would have encroached into the nearby wetlands and their buffer zones.

16. Due to the size, mass, and structure of the former dorm buildings, it would not be feasible to relocate the previously permitted buildings to respect a 100-foot side yard setback.

17. Both before and after purchasing the property at the Bankruptcy Court-sanctioned public sale, Nanak officers investigated the viability of other uses to which the pre-existing buildings could be put, particularly uses that would not require PUD approval, and the corresponding increase in the side yard setback requirement from 25 feet to 100 feet.

18. Mr. Sunny Nagra testified on behalf of Nanak that they attempted to renew the use of the property as a school by offering a considerable discount to Green Mountain College, the entity that was to have rented the space from Rome. The College declined Nanak's offer. Mr. Nagra testified that Nanak entered into a lease agreement so that the buildings could be used to house seasonal employees, as permitted by the March 9, 1999 ZBA Decision, but that venture proved to be unworkable and was terminated. Lastly, Mr. Nagra testified about unsuccessful efforts to obtain other leases with private parties. The Court finds Mr. Nagra's testimony to be both credible and relevant to the material issues in this case, as discussed below.

19. The Court also finds credible the testimony of Nanak's consultant, William Jewell, particularly as to further efforts to investigate other viable uses for the property, and his conclusion that these various investigations lead to a conclusion, not refuted by credible evidence, that the only viable future use of the pre-existing dorm buildings, with some modification, is as a hotel or motel.

20. The undisputed testimony leads this Court to conclude that the only impact to the Goes' property of the use of the abutting buildings is limited to sight and sound. No credible evidence was offered to suggest that a 92-room lodging facility located 25 feet from the boundary line would create more of an impact than a 96-room dorm

facility located that same distance away, or a similar lodging facility located 100 feet away.

## Conclusions and Order

Pursuant to the parties' stipulation and previous determinations of this Court, the only issue remaining to be determined in this appeal is whether to decrease to the as-built distance the side yard setback requirement for the two structures previously intended to be dormitories but now proposed to be converted into a 92-room commercial lodging facility. The parties agree that KZR § 505(5) authorizes the Planning Commission (and this Court on appeal) to reduce a PUD's side yard setback requirement. The parties disagree, however, on whether the ordinance's "special circumstances" test has been met by the applicant here.

Words or phrases not specifically defined in the Killington Zoning Regulations are to be "construed and understood in accordance with commonly accepted technical meanings . . . [or] as defined in a Webster's New Collegiate Dictionary no more than 5 years old." KZR § 120(1). With this reference in mind, the § 505(5) test directs us to determine whether "unique or unusual" circumstances render the 100-foot side yard setback for this PUD application inappropriate, not "suitable" or "compatible."

This case presents the following unique and special circumstances that make rigid adherence to the 100-foot PUD side yard setback inappropriate:

a. The two dormitory buildings were originally constructed in accordance with the then-existing ordinance provisions and permit.

b. The ordinance was later amended to allow for the uses of the property now suggested by Appellant-Applicant.

c. The ordinance amendments also result in the previously approved uses for the property no longer being permitted for the property. Thus, if Appellant continued to use the property as a school complex, it would be regarded as a pre-existing, non-conforming use of the property, as that term was once defined in 24 V.S.A. § 4408(a)(1), now defined in 24 V.S.A. § 4303(15). While such uses are lawful, precedent expresses a distain for

the perpetuation of such uses and encourages a replacement of such uses with a use conforming to and permitted by the current zoning ordinance. See <u>State v. Sanguinetti</u>, 141 Vt. 349, 351 (1982) (citing <u>Vermont Brick & Block, Inc. v. Village of Essex Jct.</u>, 135 Vt. 481, 482 (1977); <u>City of Rutland v. Keiffer</u>, 124 Vt. 357, 366-67 (1964)).

d. Applicant and its consultant completed a due diligence investigation of whether the previous (and now non-conforming) use of the property could be renewed, or whether other uses that are now permitted for the property could viably occur. Their investigation led them to conclude that the only viable use of the property was as a hotel or motel. No credible evidence was offered at trial as to other viable uses to which the property could be put that were also permitted uses under the amended zoning ordinance.

e. No credible evidence was offered at trial that a rigid adherence to the 100-foot PUD setback would measurably diminish the impact on the abutting property, particularly when compared to the pre-existing use or if the proposed use was conducted within a structure that was 100 feet away from the side yard boundary.

Upon initial review, Appellant's proposed conversion appeared to present a direct affront to the well established precedent of the importance of finality in municipal determinations found in 24 V.S.A. § 4472. See also <u>Town of Sandgate v. Colehamer</u>, 156 Vt. 77, 84 (1990); <u>Levy v. Town of St. Albans</u>, 152 Vt. 139, 142 (1989). The record here contains many references to specific representations by the prior owner and determinations by the Planning Commission in 1999 that the subject property should not and would not be used for commercial lodging. Where there has been a prior determination made as to use or use restriction that has not been timely appealed, that determination may not later be collaterally attacked. <u>Id</u>.

Where changes in circumstances warrant and justify flexibility over finality, we are encouraged to be flexible in allowing modification and amendment to permit approvals. See <u>In re Appeal of Hildebrand</u>, Docket No. 228-12-04 Vtec (Vt. Env. Ct., Oct. 13, 2005) (citing <u>In re Stowe Club Highlands</u>, 166 Vt. 33 (1996); <u>In re Nehemiah Assoc.</u>, 166 Vt. 593 (1996); and <u>In re Nehemiah Assoc.</u>, 168 Vt. 288 (1998)). The

numerous changes in circumstances in this appeal, listed above, provide ample foundation for the conclusion that Appellant should be granted approval for a use that was once specifically denied. We therefore conclude that the special circumstances exist that would make it inappropriate to require Nanak's proposed PUD to respect a 100-foot side yard setback, and specifically reduce the side yard setback along the side boundary shared with Mr. & Mrs. Goes to 25 feet.

Accordingly and based on the foregoing, it is hereby ORDERED and ADJUDGED that Appellant's application for planned unit development and site plan review is APPROVED, including the provision of its application that requests that the side yard setback be reduced to 25 feet. Development and use of Appellant's property shall be in accordance with the plans and exhibits submitted in this proceeding. The unappealed conditions listed in the Killington Planning Commission Decision, dated March 16, 2005 (see pages 4–7, inclusive) shall remain in full force and effect. To the extent necessary,[4] this matter is remanded to the Killington Zoning Administrator for further administrative proceedings that are in accordance with this Decision.

Done at Berlin, Vermont, this 4th day of January, 2006.

_____
Thomas S. Durkin, Environmental Judge

---

[4] This Decision concludes this appeal. Remand may only be necessary so as to allow Appellant-Applicant to receive a zoning permit or some other administrative action that would follow as a consequence of the approvals granted herein.